## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

SHERYL R. MANKLE,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

       Defendant.

**No. 08-CV-4024-DEO**

**ORDER**

_____

## I.   INTRODUCTION AND BACKGROUND

Plaintiff, Sheryl R. Mankle, (hereinafter "Mankle"), filed this action seeking review of the Commissioner's decision that she is not disabled under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. Tr. 64-69. This Court has authority to review a final decision by the Commissioner under 42 U.S.C. § 405(g).

This is Mankle's second application for disability and disability insurance benefits. Tr. 64-69. She was previously denied benefits on September 10, 2004, which the United States District Court for the Northern District of Iowa later affirmed. See Mankle v. Barnhart, 05-CV-4072-PAZ (N.D. Iowa June 1, 2006). Mankle's current application sets forth a disability onset date of July 31, 2004, the date she suffered

a subarachnoid cerebral hemorrhage[1] while at home.  Tr. 64,
130-161.  Mankle alleges a disability due to a subarachnoid
hemorrhage, basilar tip aneurysm, mitral valve repair,
thrombocytopenic purpura, and chronic anticoagulation.  Tr.
80.  She was born on March 10, 1949, and was 57 years old at
the time of the Administrative Law Judge ("ALJ") hearing.  Tr.
64.  Mankle's educational background includes a high school
diploma and an associates degree.  Tr. 337.  The record shows
that Mankle remained insured through September 30, 2008, and
has not engaged in substantial gainful activity since her
alleged onset date of July 31, 2004.  Tr. 15, 91-109.  She has
prior work experience as a reservation clerk, concession
manager, and ticket seller.  Tr. 129.

The ALJ issued his decision finding Mankle not disabled
on August 1, 2006.  Tr. 13-18.  The Appeals Council denied
Mankle's request for review on January 22, 2008.  Tr. 6-8.

In the ALJ's decision, the ALJ determined that Mankle was

---

[1] "A subarachnoid hemorrhage is bleeding in the area
between the brain and the thin tissues that cover the brain.
This area is called the subarachnoid space."  Medline Plus
Medical Encyclopedia,
http://www.nlm.nih.gov/medlineplus/ency/article/000701.htm,
visited March 27, 2009.

not disabled under §§ 216(I) and 223(d) of the Social Security Act. Tr. 18. The ALJ found that he only had jurisdiction to "consider the existence of disability as of September 11, 2004, the day after the date of the hearing decision on the prior claim," since Mankle's first application was still under review by the District Court.[2] Tr. 13.

In his decision, the ALJ proceeded through the steps of the sequential evaluation and found at step one that Mankle did not engage in substantial gainful activity since September 11, 2004. Tr. 15. Under step two, the ALJ determined that Mankle had a severe impairment of "status post subarachnoid hemorrhage." Tr. 15. At step three, the ALJ found that Mankle did not have an impairment that fell under one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. Tr. 16. The ALJ determined at step four that Mankle was capable of performing her past relevant work as a concession manager. In doing so, the ALJ found that Mankle had the residual functional capacity to -

---

[2] The ALJ was incorrect regarding the status of Mankle's first application and appeal. Judge Zoss issued his Memorandum Opinion and Order in <u>Mankle v. Barnhart</u>, 05-CV-4072-PAZ (N.D. Iowa June 1, 2006), prior to the date of the ALJ's decision here.

> lift and carry 20 pounds occasionally and
> 10 pounds frequently; push/pull 20 pounds
> occasionally and 10 pounds frequently;
> stand/walk for a total of six hours in an
> eight-hour workday; sit for a total of six
> hours in an eight-hour workday frequently
> climb ramps/stairs, but only occasionally
> climb ladders, ropes or scaffolds;
> frequently balance and kneel; occasionally
> stoop, crouch and crawl; and avoid
> concentrated exposure to hazards. Tr. 16.

On July 31, 2004, Mankle suffered a subarachnoid cerebral hemorrhage due to a ruptured aneurysm, which hospitalized her for approximately two weeks. Tr. 145, 163. Mankle's medical history shows that she suffered a stroke 20 years earlier, which caused right-sided weakness. Tr. 163. She underwent a mitral valve annuloplasty in 1999, and she suffered from Thrombotic thrombocytopenic purpura[3] and chronic anticoagulation. Tr. 163.

Hospital records upon Mankle's release showed that she required supervision due to occasional dizziness, double vision, and fatigue. Tr. 166. At that time, she could ambulate 500 feet with hand-held assistance, and she had

---

[3] Thrombotic thrombocytopenic purpura is a blood disorder that causes blood clots to form in blood vessels around the body. Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000552.htm, visited March 27, 2009.

occasional balance problems and needed assistance to regain her balance. Tr. 166. Mankle was also suffering headaches and neck aches often. Tr. 166.

Mankle stated that she suffered from head pains due to the hemorrhage as well as chest pains, which have become more frequent since the hemorrhage. Tr. 88. Mankle stated that she experienced fatigue approximately four days out of the week. Tr. 87.

Mankle's treating physician was Dr. David Robison of Spencer Family Care in Spencer, Iowa. Mankle saw Dr. Robison numerous times for physical examinations following her hemorrhage. The treatment notes from these visits often indicated that her condition had improved or that, at least on those dates, she had few complaints and denied most symptoms. Tr. 242-258, 267-270.

The record shows two residual functional capacity assessments completed by Disability Determination Services ("DDS") physicians on October 27, 2004, and February 2, 2005.[4] Tr. 259-266. The DDS physician assessed Mankle with the

_____

[4] The DDS physician who conducted the assessment of February 2, 2005, merely affirmed the findings of the October 27, 2004 DDS physician. Tr. 266.

following exertional limitations: occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. Tr. 259-260.

In arriving at these conclusions, the DDS physician noted Mankle's history of the hemorrhage, basilar aneurysm, mitral valve repair, thrombotic thrombocytopenic purpura and chronic anticoagulation. Tr. 260. The physician further noted that dizziness, nausea, head pain, fatigue, and double vision were described at discharge from the hospital in August 2004. Tr. 260. The pain questionnaire revealed, in part, "persistent head pain with increased Valsalva maneuvers[5] and bending. Head pain lasts 2-10 seconds and fatigue onset is in the

---

[5] "The Valsalva maneuver is performed by attempting to forcibly exhale while keeping the mouth and nose closed. It is used as a diagnostic tool to evaluate the condition of the heart and is sometimes done as a treatment to correct abnormal heart rhythms or relieve chest pain." http://www.healthline.com/galecontent/valsalva-maneuver, visited March 27, 2009.

afternoon. Aspirin and rest relieve both symptoms." Tr. 260-61. The physician noted that "despite fatigue and head pain, [Mankle] is able to rake her yard, wash dishes, do laundry, cleans, dusts, vacuums and repairs anything that needs it." Tr. 261.

The DDS physician next assessed Mankle with the following postural limitations: frequently climb ramp/stairs; occasionally climb ladder/rope/scaffolds; frequently balance and kneel; and occasionally stoop, crouch, and crawl. Tr. 261. Under these findings, however, the physician provided no explanation and cited to no specific facts upon which his conclusions were based. Tr. 261.

Mankle underwent a functional capacity evaluation ("FCE") at Buena Vista Regional Medical Center on April 25, 2006, just three weeks prior to the ALJ hearing. Tr. 271-299. This evaluation was quite comprehensive and included tests for grip, pinch, lifting, work activities, work postures, and job simulation/dexterity. The report indicated that Mankle gave a consistent and valid effort in all of her tests and, as such, her overall effort was reliable. Tr. 276, 287.

The results of the evaluation stated, in part, that Mankle was at risk for falls and displayed no ability for lifting from floor level. Tr. 277, 279. The results also showed that Mankle had no ability to squat. Tr. 275. Mankle's lifting ability started from her knees due to her decreased strength in her hip flexors. Tr. 277. However, Mankle displayed "an increased potential for falls with performing a knee lift above an occasional basis as evidenced by her becoming dizzy with performance of the work posture of bend at 10 reps [at] her own pace." Tr. 277. The evaluation recommended that Mankle "not perform <u>any lift above an occasional basis</u> or 1 lift every 30 minutes." Tr. 277. (Emphasis added). Furthermore, "the repetitive motions of a forward flexion such as with bending combined with her head flexion for viewing her work causes her to become dizzy." Tr. 277.

The evaluation found that Mankle could walk for nine minutes at her own pace with rest as needed. Tr. 278. This finding "would limit her ability to perform any job that requires ambulation at a pace faster than her own and would not allow her to take a rest period as needed." Tr. 278.

Mankle also reported numbness from her knee to her foot "further increasing the potential for falls whenever she is lifting or carrying or ambulating." Tr. 278.

Mankle's purdue pegboard test, which measured her dexterity, showed that she was far below average. Tr. 298. As a result, the evaluating physician stated she "is not suited to perform any type of job such as assembly or general production work as she falls below the normative population for employees who work in this area." Tr. 277. Moreover, the physician found that "sensory testing indicate[d] a diminished light touch which could interfere with any job which requires a high degree of sensation such as assembly of small parts." Tr. 277.

At the ALJ hearing, Mankle testified that her balance was poor after she left the hospital and that she worked on her walking so she could walk without scuffing her foot. Tr. 313. Mankle testified that she still had to concentrate when she walked to be sure that she lifted her right foot, since it dragged at times. Tr. 316. She further testified that she still experienced head pains as a result of the hemorrhage, especially when she bent over and when she coughed. Tr. 314,

315.

Mankle testified that she had numbness down her back and on her right side, including her right leg and two of her fingers. Tr. 316, 317. Mankle testified that the numbness in her fingers affected her ability to grip. Tr. 317. Mankle further testified that she still suffered from double vision. Tr. 317.

Mankle testified that she had severe dizzy spells that caused her to fall. These spells occurred twice per week following her hemorrhage, but later lessened to approximately once per month. Tr. 330, 331. However, Mankle still experienced less-severe dizzy spells on a daily basis. Tr. 330.

Regarding Mankle's work history, Mankle stated that she could not return to her previous work as a ticket seller or reservation clerk because of her reduced hand dexterity for typing and because she frequently dropped things since the hemorrhage. Tr. 329, 330.

Vocational Expert ("VE") Tom Audet testified at the ALJ hearing. The VE testified that, based on Mankle's testimony and her health complaints, she was not capable of working at

any occupation on a full-time basis.  Tr. 337-338.  The ALJ
then asked a second hypothetical based on the State Agency's
residual functional capacity assessment as described above.
The VE stated that, based on that assessment, Mankle could
perform all of her past work and could perform a full range of
light work, as "all of her transferable skills to like sales
clerk or any other kind of clerking activity would still be
useful." Tr. 339.  Finally, the VE testified that, based on
the results of the April 25, 2006, functional capacity
evaluation, Mankle could not perform the ticket seller job or
the concession manager job, but that there was nothing in the
evaluation that would rule out the reservation clerk job.  Tr.
340-342.  The VE stated that other work would be limited to
light.  Tr. 342.

The ALJ, in finding Mankle's residual functional capacity
as stated above, found that Mankle's complaints of her
symptoms were not credible.  Tr. 18.  The ALJ stated that the
medical evidence, her treating physician's observations, and
the functional capacity evaluation results showed that
Mankle's condition substantially improved within six months of
her hemorrhage and that she had been functioning at a near-

normal level since then.  Tr. 18.  The ALJ further found that
the "medical treatment records show significant improvement of
residual balance and memory difficulties that existed
immediately after the subarachnoid hemorrhage."  The ALJ also
disregarded Dr. Robison's opinion in his 2006 letter that
Mankle was disabled, based on certain inconsistencies between
his letter and the treatment notes.  Tr. 17.

## II.  DISCUSSION

> Our role on review is to determine if the
> Commissioner's findings are supported by
> substantial evidence on the record as a
> whole.  Baker v. Barnhart, 457 F.3d 882,
> 892 (8th Cir. 2006); McKinney v. Apfel, 228
> F.3d 860, 863 (8th Cir. 2000).  Substantial
> evidence is evidence that a reasonable mind
> would find adequate to support the ALJ's
> conclusion.  Lacroix v. Barnhart, 465 F.3d
> 881, 885 (8th Cir. 2006).  In considering
> the evidence, we must consider both
> evidence that supports and evidence that
> detracts from the Commissioner's decision.
> Karlix v. Barnhart, 457 F.3d 742, 746 (8th
> Cir. 2006).  We will disturb the ALJ's
> decision only if it falls outside the
> available "zone of choice."  Hacker v.
> Barnhart, 459 F.3d 934, 936 (8th Cir.
> 2006).  An ALJ's decision is not outside
> the "zone of choice" simply because we
> might have reached a different conclusion
> had we been the initial finder of fact.
> Id.  Consequently, we may not reverse the
> decision to deny benefits unless the record
> contains insufficient evidence to support
> the outcome.  Culbertson v. Shalala, 30

12

F.3d 934, 939 (8th Cir. 1994).
Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. Wilcutts v. Apfel, 143 F.3d 1134, 136-37 (8th Cir. 1998) citing Brinker v. Weinberger, 522 F.2d 13, 16 (8th Cir. 1975). See also Patrick v. Barnhart, 323 F.3d 592, 595 (8th Cir. 2003).

In a Social Security disability case, the claimant bears the burden to prove that she has not worked since the alleged onset of disability date because of one or more severe impairments. If the impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation, the claimant must show the inability to perform past relevant work. Although the ALJ determines the claimant's residual functional capacity at the fourth step, at the fifth and final step of the sequential evaluation the burden shifts to the Commissioner to show the existence of jobs that can be performed given the claimant's age, education, past relevant work, and residual functional capacity.

In this case, Mankle alleges several errors in the ALJ's decision.  Mankle argues that the ALJ's finding of Mankle's residual functional capacity is not supported by substantial evidence in the record.  Specifically, Mankle argues that the ALJ improperly disregarded Dr. Robison's letter of May 12, 2006.  Mankle maintains, based on her functional capacity evaluation, that she is precluded from "Light Work" in terms of the strength factor.  By that she means that she is unable to perform the levels of exertion required for light work as defined by the Dictionary of Occupational Titles.  Therefore, Mankle argues that she is disabled and is incapable of working at the level of light work.

After careful review of the administrative record, this Court is persuaded that there is not substantial evidence to support the ALJ's finding of Mankle's residual functional capacity.  Thus, there is not substantial evidence to support the ALJ's finding that Mankle was not disabled and was able to return to her prior job as a concession manager.

The ALJ sets out that the onset date is September 11, 2004.  Tr. 15, Finding #2.  However, as mentioned, Mankle suffered a subarachnoid hemorrhage on July 31, 2004, and she

argues that is her alleged onset date.  After discussing the
matter with the attorneys at the January 23, 2009, hearing
before this Court, this Court is persuaded that the
appropriate onset date in this case is July 31, 2004.  The
Commissioner stated that in his ruling of August 1, 2006, the
ALJ mistakenly believed that Mankle's first application was
still under review by the District Court, and that he
therefore did not have jurisdiction to review Mankle's current
disability claim prior to September 11, 2004.  The
Commissioner noted, however, that the ALJ looked back to the
evidence on and after July 31, 2004, which constituted a de
facto reopening of the case from that date.

The parties agreed that this Court may consider the
evidence in the record pertaining to Mankle's hemorrhage of
July 31, 2004.  This Court is persuaded that the ALJ
thoroughly and completely considered the evidence in the
record from July 31, 2004, and for months thereafter.  Tr. 16-
17.  The ALJ considered this evidence as both a starting point
for his analysis and a basis for his ultimate finding that
Mankle's condition substantially improved and that she was not
disabled.  Therefore, this Court has considered the

15

subarachnoid hemorrhage of July 31, 2004, and all of her physical and medical history up until the date of the ALJ's decision of August 1, 2006.

A.   **The ALJ Erred in Finding That Mankle Could Return to Her Past Work as a Concession Manager.**

In the ALJ's decision, he states that Mankle is capable of performing her past relevant work as a concession manager. Tr. 18.   In the VE's testimony, at Tr. 341, he states as follows:

> The concession manager job, her problem here I think is that she can only walk occasionally but could stand constantly. I kind of think the concession manager job probably requires more than occasional walking so I don't think she could return to that.

This Court recognizes that the ALJ asked the VE, at Tr. 339, the following question:

> **Question**:   Okay.  All right.  On this hypothetical could our hypothetical person perform any of the claimant's past jobs?
>
> **Answer:**   Yes, I think all of her past work would still be, would fit within the hypothetical.

The defendant makes a point that only pertains to the

16

hypothetical question that is being discussed at that time, which was hypothetical number two (Tr. 338), and which assumed the ability to walk with normal breaks. The context of the exchange makes it very clear that the ALJ was asking a question about a person whose walking was normal. It is not surprising, then, that the VE stated such an individual could perform the concession manager job. However, as the VE concluded, unlike this hypothetical individual, Mankle does not have normal walking abilities.

This Court is persuaded that the VE's opinion regarding her inability to perform the concession manager job was his final say on the subject because as he stated above, the concession manager job required more walking than she could do. This condition, i.e., being unable to walk enough, does not change because of the type of hypothetical question that is asked of the vocational expert.

Moreover, the FCE, on which the ALJ partially relied for his decision that Mankle was not disabled, specifically found that Mankle could only walk for nine minutes at her own pace, and must be able to take rests as needed. Tr. 278. A concession manager, as the VE testified, requires more than

occasional walking.  The FCE also found that Mankle displayed no ability for lifting from floor level and no ability to squat.  Tr. 277, 279.  Mankle could not perform the demands of a concession manager with these limitations.

The ALJ, in his decision, states as follows:  "The claimant indicated that she is able to perform typical yard work if she paces herself, to drive or ride in a vehicle for one hour at a time, to sit through a typical movie, and to walk for two hours."  Tr. 17.  However, when Mankle testified at the hearing, she stated:

> – – balance was not good when I got out of the hospital and that.  I, I didn't have much to do during the day.  I couldn't see very well but I did go out and try to pull weeds out of my garden and I'd just keep toppling over so that was out of the question.

Tr. 313.

She certainly cannot walk for two hours as is fully discussed in this ruling, and her significant balance problems prevent her from being able to perform the duties of a concession manager.  For these reasons, the ALJ erred in concluding that Mankle could perform the concession manager position.

The Court is further persuaded that Mankle's complaints of numbness in her fingers, along with the results of the purdue pegboard test, show that Mankle could not possibly return to her work as a reservation clerk and corroborate her testimony that her compromised dexterity would prevent her from using a keyboard. Finally, Mankle could not return to her work as a ticket seller because the record establishes that she does not have the ability to reach out on a constant basis. Tr. 279.

**B.     The ALJ Erred in Finding That Mankle Could Perform Full-Time Employment.**

Although the ALJ's analysis ended at step four when he found Mankle could return to her past relevant work as a concession manager, the ALJ nevertheless found that Mankle had the residual functional capacity to perform full-time employment. Tr. 16. The record, however, substantially supports a finding that, at step five, Mankle could not perform any work in the national economy on a full-time basis.

The complaint filed by Mankle, (Doc. No. 2), states as follows:

Mankle is disabled within the terms of the Social Security Act, that she is unable to engage in any substantial gainful activity for any continuous period of time, which disability has lasted for at least 12 months...

While the parties did not place much emphasis on Mankle's work history, the record is quite clear and this Court is persuaded that it should be set out herein. In the ALJ's earlier ruling, dated September 10, 2004, the ALJ states as follows at Finding #2:

The claimant alleged "disability" since September 8, 2002; however, she engaged in disqualifying substantial gainful activity from May 2003 to September 1, 2003. Accordingly, "disability" cannot be established prior to September 2, 2003.

Tr. 39.

In the ALJ's decision of August 1, 2006, Tr. 15, finding #2 states as follows:

The claimant has not engaged in any substantial gainful activity since September 11, 2004, the alleged onset date ... Although the claimant has performed some work since the alleged onset of disability, the evidence shows that the earnings from the work did not reach the level of substantial gainful activity.

At Tr. 17, the ALJ, in his decision, states as follows:

At the hearing, the claimant testified that she works three or four days a week for around 6 hours a day.

At the ALJ hearing, Mankle states the following in response to the ALJ's questions regarding her work as a reservation clerk:

**Question:** Were you working full or part time?

**Answer:** Full Time.

**Question:** Like 40 hours a week?

**Answer:** Yes.

**Question:** Year round?

**Answer:** Right.

**Question:** Well, the earnings reported your account at $4,400, which doesn't sound like full time work.

**Answer:** That doesn't sound like full time work at all.

Tr. 324.

At Tr. 325, the ALJ is again asking questions regarding Mankle's past employment:

**Question:** Okay. Is it a true statement that your primary occupation for the last 15 years has been the seasonal

> employment at Arnolds
> Amusement Park?

**Answer**: Correct.

In the closing argument at the hearing before this Court, counsel for Mankle stated as follows:

> The difference between her hearing before and this hearing is that she essentially really wasn't able to go back at anything near substantial gainful employment activity.

This statement is supported by her work history report. Tr. 91-109. The Court notes it is not entirely clear when Mankle last worked full-time, but the record shows that she has certainly not worked full-time since 2000. Tr. 91-109.

Under Social Security Ruling (SSR) 96-8p, a person's residual functional capacity must be evaluated based upon work performed on a regular and continuing basis, which means 8 hours a day for 5 days a week or an equivalent work schedule. The Commissioner's position is that, "at step five of the disability determination, 'only an ability [on the part of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled.'" Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000).

> We have stated, however, that to qualify
> for work at any level a claimant must have
> the ability to perform the requisite
> physical tasks of employment on a daily
> basis ... An ALJ should not penalize a
> claimant who, prior to an award of
> benefits, attempts to make ends meet by
> working in a modest, part-time job. The
> presumption that a claimant is not disabled
> merely because the claimant had a lenient
> employer, a high tolerance for pain, or no
> other means of support would unfairly shift
> the burden of proof back onto the claimant
> at a point in the proceedings when the
> burden rightfully belongs to the Secretary.

Cline v. Sullivan, 939 F.2d 560, 565-66 (8th Cir. 1991).

In the ALJ's conclusion number 5, at Tr. 16, he concludes that Mankle can stand/walk for a total of six hours in an eight hour work day. Mankle testified, however, that she could not work a job for eight hours a day, five days a week. Tr. 329. She also testified that she would have a headache and have to take a nap after working just three and a half hours. Tr. 329. She testified that after getting up from her nap, she felt like she "had been beaten in the chest by a hammer." Tr. 329.

The ALJ found that Mankle had not engaged in substantial gainful employment since September 11, 2004. Tr. 15. However, as mentioned, Mankle suffered a horrendous

subarachnoid hemorrhage on July 31, 2004. The Court notes that Mankle did not work during any of this period up to the date of the ALJ hearing. Although this issue was not stressed by counsel for either side in this case, it is clear to the Court that Mankle has not and could not work in anywhere near a full-time position.

As mentioned, the ALJ noted in his finding that Mankle indicated she was "able to perform typical yard work if she paces herself, to drive or ride in a vehicle for one hour at a time, to sit through a typical movie, and to walk for two hours." Tr. 17. The DDS physician from Mankle's residual functional capacity assessment noted that "despite fatigue and head pain, [Mankle] is able to rake her yard, wash dishes, do laundry, cleans, dusts, vacuums and repairs anything that needs it." Tr. 261. However, in the case of Sehlstrom v. Astrue, 2008 WL 4443053 (N.D. Iowa Sep. 26, 2008), this Court in discussing a similar situation quoted as follows:

> [The] ability to engage in some life activities ... does not support a finding that [a claimant] retains the ability to work ... We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has "the ability to perform the requisite

> physical acts day in and day out, in the
> sometimes competitive and stressful
> conditions in which real people work in the
> real world.

Sehlstrom, 2008 WL 4443053, at *8 (quoting McCoy v. Schweiker,

683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  As stated in

Sehlstrom, "the ability to do light activities around the home

'provides little or no support for the finding that a claimant

can perform full-time competitive work.'"  Sehlstrom, 2008 WL

4443053, at *8 (quoting Baker v. Barnhart, 457 F.3d 882, 897

(8th Cir. 2006)).

For these reasons, this Court is persuaded that
substantial evidence on the record does not support the ALJ's
decision that Mankle is able to perform full-time employment.
This Court has, for good reasons, set out that the ALJ's
decision that Mankle could perform her past relevant work as
a concession manager is not supported by the vocational
expert's testimony and, given her obvious, well-documented
impairments, there is no other job that would qualify her as
being able to work full-time.  The ALJ erred in finding that
Mankle could work a full, eight-hour work day.

**C.  Mankle Needs Continued Treatment but Cannot Afford Adequate Medical Care**

The Court notes that there are a number of places in the record that show Mankle is unable to obtain necessary treatments due to her inability to pay for insurance or adequate care.  For example, Mankle testified at the hearing, "... my neurologist up in the Mayo Clinic has been calling me. He wants me to go up for an angiogram but I can't afford it. I don't have insurance..."  Tr. 328.

An angiogram is a somewhat complicated procedure that is used to diagnose a variety of vascular conditions, including:

- Blockages of the arteries outside of your heart, called peripheral artery disease (PAD);

- <u>Enlargements of the arteries, called aneurysms</u>;

- kidney artery conditions, called renovascular conditions;

- problems in the arteries that branch off the aorta, called aortic arch conditions;

- Malformed arteries, called vascular malformations; and

- Problems with your veins, such as deep venous thrombosis (DVT) or blood clots

in the lungs called pulmonary emboli.[6]

An angiogram would certainly spot aneurysms and would help prevent future strokes to which Mankle is susceptible given her medical history.

Moreover, the ALJ did not express concern about Mankle's orthostatic blood pressure in his decision when he stated that "the claimant was noted to be better with some orthostatic blood pressure changes if she moved too fast, she indicated (that this condition) had been present her whole life..." Tr. 16. Orthostatic blood pressure is a form of low blood pressure measurements in an individual that occurs when the individual stands up from sitting or lying down. Among the symptoms are dizziness, which Mankle has a history of, especially after her subarachnoid hemorrhage in July of 2004.[7]

Dr. Robison has indicated the need for continued treatment, but that Mankle lacks the necessary funds to pay for such treatment. In Dr. Robison's letter to David Scott

---

6

http://www.vascularweb.org/patients/NorthPoint/Angiogram.html, visited March 27, 2009. (Emphasis added).

7

http://www.mayoclinic.com/health/orthostatic-hypotension/DS0 0997/METHOD=print, visited March 27, 2009.

dated May 12, 2006, Tr. 300, he states as follows:

> My overall feelings have not changed since
> my letter dictated on March 24, 2004...

This Court is aware that the Government objects to any
mention of Dr. Robison's letter of March 24, 2004.  However,
the Court is not using this letter as a basis for finding that
Mankle was disabled during the relevant time period in this
case.  Rather, the portion of the letter cited below was true
in 2004 and was also true in 2006, and shows that Mankle
needed additional medical care.  In the letter of 2004, Dr.
Robison stated:

> Her biggest problem is she has no funds,
> she cannot work and so she does not get
> appropriate care.  She cannot access the
> healthcare system.  She does not get
> adequate medical care.  She cannot get her
> renal artery stenosis taken care of because
> she has no funds to pay for the angioplasty
> that she needs.

In his decision, the ALJ did not even mention the matter
of her need for an angiogram or the fact that she had no funds
which covered any of her medical needs.  In the case of <u>Tome</u>
<u>v. Schweiker</u>, 724 F.2d. 711 (8th Cir. 1984), the Eighth
Circuit states as follows:

> The Secretary's regulations provide that a
> claimant who fails to treat a remediable

condition without good reason is barred
from entitlement to benefits. (Citations
omitted). Appellant's testimony as well as
the medical reports leave little doubt that
appellant did not consciously decide not to
follow "doctor's orders," but rather lacked
the financial resources and the discipline
and education needed to understand and
follow a strict dietary and insulin
regimen. (Citations omitted) ... this
court held that in determining whether an
impairment is reasonably remediable, the
question is whether it is reasonably
remediable by the particular individual
involved, given his or her social and
psychological situation. Furthermore, we
believe that a lack of sufficient financial
resources to follow prescribed treatment to
remedy a disabling impairment may be, and
in this case is, an independent basis for
finding justifiable cause for noncompliance
... We therefore reverse the judgment
entered by the district court in favor of
the Secretary and order an award of
benefits to appellant.

Tome, 724 F.3d at 714-715.

The ALJ concluded that Mankle was not disabled over a 12

month period despite very serious problems as of the onset

date of July 2004. Tr. 16. This Court is persuaded that had

she been able to have the care that was recommended, her

condition would have potentially improved. Thus, the ALJ

erred in not considering her need for additional care and her

clear record of not having sufficient funds to obtain adequate

health care as required by the Eighth Circuit in <u>Tome</u>.

**D.   Credibility of Mankle and Her Physician**

As mentioned, Mankle suffered a horrendous subarachnoid hemorrhage on July 31, 2004.  She was taken to the hospital in Spencer, Iowa, and then transferred to the Mayo Clinic in Rochester, Minnesota, where she was hospitalized for nearly two weeks.  Tr. 145, 163.  She had many serious problems as a result of this hemorrhage, including double vision, the inability to swallow, the loss of function of her right leg, severe head pain, the inability to spit, and numbness on the right side of her leg.  Mankle was in bad shape for months thereafter but, as the record shows, she had some improvement.

The Government points out that at her annual physical examination on December 14, 2004 – some four and a half months after the hemorrhage – Mankle denied any headaches, blurred vision, double vision, shortness of breath, cough, dyspnea with exertion, gait disturbance, weakness in her back, numbness, tingling, or paresthesias. During that examination, the doctor did, however, note that she had, based on chest X-rays, mild and unchanged chronic obstructive pulmonary disease, but that her lung function was normal.  Tr. 242-243.

The record is clear that her doctor found that her condition improved since the hemorrhage on July 31, 2004.

The Government further points out that on March 22, 2005 - some 9 months after her hemorrhage - Mankle stated that she no longer had any balance problems, that she experienced less and less memory problems, and that she was feeling better. Tr. 269.

The Government argues that Mankle was not disabled during the 12 month period following her July 31, 2004, hemorrhage. In support of this argument, the Government asserts that Mankle's own statements, which included her denial of symptoms, along with Dr. Robison's notes regarding her progress, together show that she was really not suffering much from the hemorrhage.

At the ALJ hearing, Mankle, according to the Government, made many statements that must be false because they were contrary to what she had previously told Dr. Robison, as mentioned above. For example, she testified she had head pain at the time of the hearing (Tr. 314), that she couldn't brush her teeth (Tr. 316), that she still had numbness in her fingers (Tr. 316), and that she still had double vision (Tr.

317, 318).

There was quite a discussion at the ALJ hearing between Mankle and her attorney in relation to Mankle's complaints of double vision.  The ALJ listened for a couple of pages in the transcript and then, at Tr. 318, he said he wanted to talk directly with her about her double vision.  The ALJ and Mankle went through several questions where she told him specifically what part of her eyesight involved double vision.  According to Mankle, while looking straight ahead, she didn't have much, if any, double vision, but to the right side and the left side, she testified that she did.  Tr. 318-320.

The Government argues, as mentioned above, that this is in direct conflict with what Mankle previously told her doctor at her annual checkup and at other meetings prior to the date of the ALJ hearing.  The Government argues, and the ALJ concluded, that she was telling the truth to the doctor in the months after her hemorrhage.  However, the ALJ's decision shows that he did not consider or believe much of her testimony at the hearing, and that he particularly doubted her allegations of double vision.  The scenario of this would have to be that Mankle was honest during her annual checkup and

thereafter, but at the time of the hearing, she decided that she wanted to receive benefits so she told many falsehoods about her situation on that date. The ALJ either ignored her testimony or concluded that she deliberately falsified her answers as to the problems she was having on the day of the hearing. This Court is reluctant to conclude that she flatly decided to help herself by false testimony. It is very hard for this Court to believe that as she and the ALJ went through the portion where she described her double vision, she was strictly making it up as he asked the questions.

While credibility determinations are generally left to the ALJ in the first instance, the inconsistencies relied upon by the ALJ to reject Mankle's testimony do not provide a sound basis for such a broad discounting. Indeed, Mankle's testimony is amply supported by evidence in the record. For example, the results of the functional capacity evaluation, which was conducted just three weeks prior to the ALJ hearing, showed that Mankle was suffering from many of the problems that she complained of during her testimony, including issues with her balance, walking, and her dexterity and numbness in her fingers. The Court further notes that the results showed

that Mankle's efforts during the evaluation were completely valid and reliable. Tr. 276, 287. While the Court recognizes that Mankle's condition improved after her hemorrhage, the substantial evidence on the record supports her complaints. The ALJ erred in finding Mankle's allegations and testimony not credible.

The treating physician, Dr. Robison, who has treated Mankle for some years, stated in his May 2006 letter to Mr. David Scott, attorney for Mankle, the following:

> As per your request ... concerning Sheryl Mankle's disability functional capacity exam ... I do not dispute [the evaluating physician's] physical findings on a purely mechanical evaluation of her abilities. However, her functional capacity problems lie with her disability to mental capacity to handle stressful situations and her ability to cognitively work in a normal work environment, due to her strokes and ongoing medical problems. I feel that she is unable to do any type of gainful employment not only based on her physical impairments and limitations, which are well borne out in her functional capacity exam, but also in her cognitive and mental abilities to perform under any kind of stressful situation. Plus I'd be very concerned about her balance and dexterity which were hinted to in the functional capacity exam as having problems. Because of her strokes, she would be at risk for falls ... My overall feelings have not changed since my letter dictated on March

24, 2004 that I consider Ms. Mankle
disabled.

Tr. 300.

In writing this letter, it is reasonable to presume Dr.
Robison was mindful of the seemingly inconsistent statements
made to him by Mankle at her annual physical and later.
Moreover, he wrote this letter long after these statements
were made.

In <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996), the
Court observed: "the Commissioner's determination must be
based on testimony and medical evidence in the record. And,
as this Court has counseled on many occasions, ALJs must not
succumb to the temptation to play doctor and make their own
independent medical findings." Likewise, in <u>Ness v. Sullivan</u>,
904 F.2d 432, 435 (8th Cir. 1990), the Court noted that the
ALJ had "ignored the law of this circuit, which states that
the ALJ must not substitute his opinions for those of the
physician." Here, the ALJ erred in not giving sufficient
weight to Dr. Robison's opinion that Mankle was disabled.

Mankle's attorney, during the hearing before this Court,
stated her overall situation quite clearly when he said, "over
the last many years, she's had about as severe problems as one

could have." This Court agrees.

For the reasons stated herein, this Court is persuaded that substantial evidence on the record does not support the ALJ's finding that Mankle was not disabled. This Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record contains sufficient evidence to allow the Court to render this decision.

III.     **CONCLUSION**

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Mankle with an onset date of July 31, 2004. The Court is persuaded that as of this date, the record reflects that Mankle suffered a subarachnoid hemorrhage, which left her disabled.

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Mankle's attorney wishes to apply for EAJA fees,

he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 31st day of March, 2009.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa